**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**MARY ANN ARNOLD**

  **Plaintiff,**

  **v.**

**UNITED AIRLINES, INC.,**

  **Defendant.**

**Case No.: 22-cv-00405**

**Judge Charles P. Kocoras**

---

<u>**DEFENDANT'S LOCAL RULE 56.1(a)(3) REPLY TO PLAINTIFF'S STATEMENT
OF ADDITIONAL MATERIAL FACTS**</u>

Defendant United Airlines, Inc. ("Defendant" or "United"), by its attorneys, Riley Safer Holmes & Cancila LLP, responds to Plaintiff Mary Ann Arnold's ("Plaintiff" or "Arnold") Local Rule 56.1(b)(3) Statement of Additional Facts as follows:

**PROTECTED ACTIVITY**

1. Plaintiff Mary Ann Arnold ("Arnold" or "Plaintiff") made several protected complaints while working for Defendant United. These protected complaints also included Arnold complaining about her treatment during her 2019 year-end review and the PIP. (Plaintiff's Exhibits 1-9, 14).

   **REPLY:** Admitted that Arnold raised several concerns while working for United, including concerns about her 2019 year-end review and the PIP she was put on. The allegation that these were all "protected complaints" is a legal conclusion, and United denies that all of Arnold's complaints were protected.

2. The first complaint made in 2017 against Danyele Hawkins ("Hawkins") was for age discrimination and failure to promote based on disability. Arnold's had worked for the Defendant since 1994. Arnold filed this complaint both internally with United, who stated that they could not substantiate her claims, and with the Illinois Department of Human Rights where she later withdrew the complaint. (Plaintiff's Exhibits 1-2, 4-5)

**REPLY:** Admitted.

3. The second complaint made in 2018 was against then supervisor, Stephen Jones for sexual harassment. Arnold initially made her allegations anonymously on July 6, 2018, but no action was taken by United. Arnold later resubmitted her allegations using her name on September 28, 2018, in an effort to get United to pursue the allegations. The complaints made against Stephen Jones included him inviting her back to his room for a nightcap and that he had told his wife he and Arnold "had a special relationship and were lovers." United found Arnold's claims to be unsubstantiated. (Plaintiff's Exhibits 3, 6).

**REPLY:** Admitted that the cited exhibits reflect Arnold's complaint of sexual

harassment against Stephen Jones, first submitted anonymously and then identifying

herself, and such complaint speaks for itself. Denied that no action was taken by United,

as United investigated the complaint and concluded that it was not substantiated, but

United nevertheless changed Arnold's reporting relationship so she no longer had to

report to Stephen Jones and her seating arrangement was changed so that she would be

further away from Mr. Jones. (See Defendant's Local Rule 56.1(a)(2) Statement of

Material Facts ("D. SOF") ¶ 14.)[1]

4. As a result of Arnold's complaints against Stephen Jones she was removed from his team sometime in December 2018 and allowed to report to Stephanie Millichap ("Millichap") as to avoid further interactions with Stephen Jones. (Defendant's Exhibit A, Arnold Dep. pp. 23-24:23-2).

**REPLY:** Admitted that as part of the outcome of her 2018 complaint, United changed

the reporting relationship so that Arnold no longer had to report to Stephen Jones (she

began reporting to Stephanie Millichap) and her seating arrangement was changed so that

she would be further away from Mr. Jones. (Def. SOF ¶ 14.)

---

[1] In Plaintiff's Responses to Defendant's 56.1 Statement of Undisputed Material Facts ("Pl. Resp. to Def. SOF"), Plaintiff skipped Def. SOF paragraph 14 and erroneously responded as paragraph 14 to what was alleged in Def. SOF paragraph 15. As a result, starting with Def. SOF paragraph 14, every paragraph of Pl. Resp. to Def. SOF is misnumbered by one paragraph.

**Corporate Restructuring**

5. On or about September 3, 2019, United's corporate communication structure changed, and Arnold began to report to Courtney Schall ("Schall") and Laura Patterson ("Patterson") (Defendant's Exhibit A, Arnold Dep. p. 32:1-5).

   **REPLY:** Admitted.

6. Initially, the Plaintiff was directed to move from the 17th floor to the 13th floor in a cubicle right near Stephen Jones despite the two of them being on a different team and Schall and Patterson being aware of her problems with Jones. (Plaintiff's Exhibit 10; Arnold Dep. p. 28:12-19; 31:23-33:7; 34:1 – 36:19; 45:15 – 47:5; Exhibit 9 to Arnold Dep [p. 76-81 of 175]).

   **REPLY:** Denied that Arnold was ever asked to sit "right near Stephen Jones" or that Arnold and Jones were on different teams from the perspective of their manager, Patterson. Following the reorganization, Arnold complained internally because she was being asked to sit with the rest of her team in a seat she described as being close to Stephen Jones. In her complaint, Arnold "was asking to sit on a different floor or on the opposite side, anywhere away from – with a reasonable amount of distance" from Stephen Jones. (Def. SOF ¶ 59; Pl. Resp. to SOF ¶ 58.) Patterson asked Arnold to move floors because she wanted everyone on the team to be in the same area, which made sense to Schall. (Schall Dep. Vol. I at pp. 34-35. 39.) The seat that was originally identified for Arnold was in a different row or aisle than where Stephen Jones was sitting and was not close to Jones. (*Id.* ¶ 60).

7. Only one other member of Arnold's previous team, a Comparable Coworker (was transferred to report under Schall. (Defendant's Exhibit A, Arnold Dep. pp. 39-40:24-7).

   **REPLY:** Admitted.

8. The Comparable Coworker is younger than Arnold. (Defendant's Exhibit A, Arnold Dep. p. 42:8-11).

**REPLY:** Admitted. However, both Arnold and the "Comparable Coworker" (hereinafter the "Coworker") are over 40 years old, and the Coworker is only 6 years and 4 months younger than Arnold. Arnold's date of birth is 10/3/68 and the Coworker's date of birth is 2/10/75. (Pl. Resp. to SOF ¶ 1; Declaration of Dorota Karpierz, ¶ 2, attached hereto as Defendant's Exhibit F.)

9. As part of the reorganization, a major project Core4 was taken away from Arnold and given to a younger employee. (Defendant's Exhibit A, Arnold Dep. p. 70:13-23).

**REPLY:** Admitted, except denied that this was a "major project" or that Arnold testified that it was, and denied that Patterson knew or considered the ages of the employees who were assigned the remaining tasks on the Core4 project as well as other projects that were reassigned to them from people other than Arnold. By the time of the Corporate Communications reorganization in September 2019, the Core4 project, a United service concept introduced in or about January 2018, had been in place for well over a year, and other than occasional limited administrative requests, Core4 was essentially complete and was no longer its own project. As part of the reorganization and to promote efficiencies, a team was created and charged with managing communications for large integrated campaigns and projects that spanned across many operations teams (as opposed to just one team), such as Uniforms programs and campaigns around Customer Service and Net Promoter Score (NPS). Patterson added responsibility for any remaining Core4 tasks, along with multiple operations-wide type projects that Arnold was not a part of, to that team. (Def. SOF ¶ 71.) At the time that Patterson assigned the projects to the newly created team, including the remaining Core4 tasks, Patterson was not aware of and did not consider the ages of the members of that team and did not consider Arnold's age. Neither Arnold's age nor any complaints she may have made played any role in any of

Patterson's decisions, including assigning remaining Core4 tasks to the newly created team, her assessments of Arnold's job performance and the decision to put her in a PIP. (*Id*. at ¶ 72.)[2]

10. Once Arnold switched teams, the projects she was given had far less visibility and partner interaction. This was despite the fact that her business partners had all praised her work on the Core4 and were confused by the fact she was taken off the project. (Defendant's Exhibit A, Arnold Dep. pp. 130-131:22-8).

**REPLY:** Admitted that Arnold so testified. However, Schall testified that "everybody had production work to do. There was really no difference in Mary Ann's mix of work versus [the Coworker's] mix of work and that Arnold "was probably given far less to do because she was a far poorer performer, far less reliable." (Schall Dep., Vol I, at pp. 50-51.) Further, when asked at her deposition if she thought the reason she was getting too much work was because of her age, Arnold replied: "I don't know." (Arnold Dep. at p. 49.)

11. After starting to report to Schall, Arnold was given a lot more work despite reaching out to try and alleviate the pressure. (Defendant's Exhibit A, Arnold Dep. p. 50:21-23; Plaintiff's Exhibit 11).

**REPLY:** Denied that Arnold was given a lot more work than the Coworker. (*See* Reply ¶ 10 above, incorporated herein.) In fact, Arnold sent an email to Schall on October 23, 2019, asserting that she **and** the Coworker were "both drowning" in work and that the "new volume of work that's been delegated to the two of us from corp comm and all of

---

[2] The Patterson Declaration states that at the time she assigned projects including Core4 to the newly created team, she "was not aware of and did **not** consider the ages of the members of that team and did not consider Arnold's age." (Patterson Decl. at ¶ 7.) Paragraph 72 of Def. SOF included a typo consisting of inadvertently omitting the word "not" that is part of the cited sentence from the Patterson Declaration. Patterson obviously could not have considered the ages of members of the team because she testified that she was not aware of their ages, as stated in her Declaration and in Def. SOF ¶ 72. The inadvertent omission of the word "not" was a typo.

AO is hard to keep up-up with. It's no surprise this has and will compromise our stakeholder support and quality of work." (Arnold Dep., pp. 50-51.) Further, when asked at her deposition if she thought the reason she was getting too much work was because of her age, Arnold replied: "I don't know." (Arnold Dep. at p. 49.)

### Arnold's Discomfort with Stephen Jones

12. Arnold discussed her discomfort with Stephen Jones with all three of her supervisors including that it was hard to work with and around Stephen Jones. (Defendant's Exhibit A, Arnold Dep. p. 28:12-19; 29:11-16; 30:10-12; Defendant's Exhibit B, Schall Dep. p. 19:15-20; 19-20:21-1; 31:15-19; 38:11-15; 100:3-11). This includes complaints that she had a physical reaction to being around him and receiving emails from him. (Plaintiff's Exhibit 12).

**REPLY:** Admitted, but as part of the investigation into her 2018 complaint against Jones, even though it was not substantiated, Arnold was allowed to report to a different supervisor (Millichap) and her seating was moved away from Jones, and denied that Arnold was ever required to sit "right near Stephen Jones" after she made her complaint against him. (*See* Reply to ¶¶ 4 and 6 above, incorporated herein.)

13. Arnold had specific conversations with both Schall and Patterson regarding her discomfort with Stephen Jones. Schall was supportive while Patterson was less so stating that she could not guarantee to keep the two apart as they "had a job to do." (Defendant's Exhibit A, Arnold Dep. p. 32:15-17; 36 8-16).

**REPLY:** Denied that this fully and accurately reflects Arnold's testimony. Arnold testified that Patterson was also supportive to some extent, and that Patterson also told her that she would "do everything I can to keep you apart". (Arnold Dep., p.36.)

14. In fact, despite Arnold having made sexual harassment allegations against Stephen Jones and being moved from his team to Millichap, and the fact that Stephen Jones was on a separate team, Arnold was notified by Laura Patterson that she was going to have to move to a cubicle within close proximity to Stephen Jones. (Defendant's Exhibit A, Arnold Dep. pp. 23-24:23-2; 36:8-16; 45-46:23-2; 46:17-23; Plaintiff's Exhibit 10). The Plaintiff complained and asked to stay on the 17th floor. Even though the team originally determined that Arnold could stay on the 17th floor where she was presently working, Arnold was subsequently told she would be moved to the 13th floor near Jones and that

she would have to find a way to work with Stephen Jones as they were part of the "same team" (Defendant's Exhibit A, Plaintiff's Dep at Exhibit 9; Plaintiff's Exhibit 13).

**REPLY:** Denied that Arnold and Jones were not on the same "team" from Patterson's perspective, denied that Arnold was ever asked to sit in "close proximity" to Jones, and denied that Arnold's only proposed solution was her staying on the 17th floor. (*See* Reply to ¶ 6 above, incorporated herein.) With respect to her complaints about seating after the reorganization, it is undisputed that Arnold "was asking to sit on a different floor or on the opposite side, anywhere away from – with a reasonable amount of distance" from Stephen Jones. (Def. SOF ¶ 59; Pl. Resp. to SOF ¶ 58.)

15. Arnold's issues with her seating arrangement regarding her proximity to Stephen Jones were not resolved until she escalated the issue to a member of United's legal team, Garrison Phillips. (Defendant's Exhibit A, Arnold Dep. p. 48 and Plaintiff's Dep Exhibit 9).

**REPLY:** Admit that Arnold testified that after she contacted Garrison Phillips she "was able to get a better seating solution on the floor but outside the direct area". (Arnold Dep. at p. 48.) Denied that Arnold was ever asked to sit right near or in close proximity to Jones. (*See* Reply to ¶¶ 6 and 14 above, incorporated herein.)

16. Prior to escalating the matter to Garrison Phillips, Arnold attempted to resolve the matter with her team's HR partner, Genesis Tirado ("Tirado") and her boss Preet Michelson ("Michelson"). (Defendant's Exhibit A, Arnold Dep. pp. 132-133:16-1). During that meeting Michelson told Arnold she would have to decide if she wanted to continue working at United long-term. (Id.)

**REPLY:** Denied that the alleged "continue working" comment was made during a meeting with Michelson and Tirado. Arnold testified that in a phone call between herself and Michelson, Michelson allegedly told her that she would need to sit with the team and also allegedly said that Arnold would need to decide if working here long term is going to work for her." (Arnold Dep. at p.135.) Other than saying Arnold would have to sit with

the team, Arnold could not recall whether or not Michelson told her that her seat would

not be moved." (*Id*. at p. 136.)

17. Unbeknownst to Arnold, her management was conspiring with their HR partners, Genesis
Tirado and Preet Michelson to ensure that Arnold had to sit in close proximity to Stephen
Jones and the parties involved were highly annoyed with Arnold. (Plaintiff's Exhibit 13).

**REPLY:** Denied. There was no attempt ever to make Arnold sit in close proximity to

Jones. (*See* Reply to ¶ 6 above, incorporated herein.)

18. Arnold also had a meeting with Garrison Phillips, Dana Reinglass and Tirado regarding
her concerns about Stephen Jones and her seating placement. (Defendant's Exhibit A,
Arnold Dep. p. 55:1-6). Dana Reinglass was 16 minutes late for a 30-minute meeting and
the meeting could not be conducted without him. (*Id.* at p. 55:13-16). In this meeting, the
parties were dismissive of Arnold's concerns. (*Id.* at p. 55:19-22).

**REPLY:** Admitted that this meeting was held, unknown whether Reinglass was 16

minutes late, and denied that the parties in the meeting were dismissive of Arnold's

concerns. Arnold testified that she was told in the meeting that her claims had been

investigated and that United found them to be without merit and that she would receive a

written response to each of her claims. Arnold acknowledges that she did, in fact,

subsequently receive an email from Tirado containing a point-by-point response to her

claims, the upshot of which was that the company did not agree with Arnold's assertions

of age discrimination or retaliation. (Arnold Dep., pp. 56-57.).

19. Arnold also had a meeting with Krista Fisher, who was her original HR partner before the
corporate restructuring regarding her discomfort and concerns with Stephen Jones.
(Defendant's Exhibit A, Arnold Dep. p. 164:4-7). Krista was also dismissive of the
Plaintiff's complaints. (*Id.*) In their second meeting Krista Fisher was not even paying
attention and was texting under the table. (*Id.* at 169:16-23).

**REPLY:** Admitted that Arnold so testified as to her perceptions of Fisher during the

meetings.

20. During her deposition, Schall was clear to point out that in evaluating her subordinates,
her job was to evaluate work performance without taking into account workplace

stressors such as Arnold's discomfort working with Stephen Jones. (Defendant's Exhibit C, Schall Dep. Vol II p. 100:3-11).

**REPLY:** Denied that this accurately describes Schall's testimony. Schall testified as follows: "My role was to evaluate Mary Ann's performance and – you know, that wasn't a matter of making considerations for what she was experiencing outside of just the regular workday and work expectations." (Schall Dep., Vol II, at p. 100.)

21. Arnold's 2018 year-end review was conducted by her then supervisor, Stephanie Millichap. However, Millichap admitted that the feedback and rating given had actually been authored by Stephen Jones whom Arnold had made previous sexual harassment claims against. (Defendant's Exhibit A, Arnold Dep. p. 63:3-21).

**REPLY:** Denied that Millichap told Arnold that all of the feedback or the rating came from Jones. Arnold testified that Millichap told her that because Arnold had only recently started reporting to her since and she had reported to Jones for the bulk of the year, Millichap had conferred with Jones on Arnold's review, and the majority of the comments had come from her mid-year review prepared by Jones. (Arnold Dep. at pp. 63-64.) In any event, Arnold's rating on the review was "Achieves," and Arnold does not know whether Millichap or Jones gave her that rating, or whether it was a collaboration between the two. (*Id.* at pp. 64-65.) Additionally, Jones' 2018 mid-year review and rating of Arnold was "On track with peers". (Def. SOF ¶ 21.)

22. Prior to Arnold's 2019 Year-end Performance Review, Arnold had not received a rating below "Achieves" in any of her previous reviews. (Plaintiff's Exhibit 15).

**REPLY:** Admitted except Arnold's 2018 mid-year review rating was "On track with peers". (Def. SOF ¶ 21.)

### Arnold's 2019 Year-end Performance Review

23. Unbeknownst to Arnold, Tirado, Preet, Patterson and Reinglass met in October 2019 to discuss the Plaintiff's complaints about sitting near Stephen Jones and conspired to create performance issues for the Complainant. During those meetings, they also talked about

discharging the Plaintiff and offering her a severance package. Specifically, Tirado asked "What is the rationale for providing a severance package? What Message are we sending by providing her an 'option' to leave'?" Ultimately, it was decided that they would "focus on performance". (Defendant's Exhibit D, Tirado Dep. pp. 25-27; 30-31; Plaintiff's Exhibit 13).

**REPLY:** Denied in that the allegation that they "conspired to create performance issues for the Complainant" is argument, not supported by the cited record and false, and denied that this paragraph fully and accurately describes the meeting. Tirado testified that before Arnold had started reporting to Schall and Patterson, and before Arnold raised concerns with them about her seating situation with respect to Stephen Jones, Millichap had come to Tirado to discuss performance concerns she was having with Arnold. (Tirado Dep. at pp. 26-29.) Tirado further testified that there was another conversation during the period of transition from Arnold reporting to Millichap to her reporting to Schall "to share knowledge and compare experiences with Mary Ann." (*Id*. at p.31.) The record does not support the allegation that there were any "meetings" at which discharging Arnold and offering her a severance package was discussed. In an email exchange between Patterson, Tirado, Michelson, and Reinglass dated October 9, 2019, Patterson did comment at one point as to whether there are options to offer Arnold a package, and Tirado replied, "What is the rationale for providing her a package? What message are we sending by providing her an option to leave (especially if she has not shared she wants to leave)." Patterson responded that her question was exploratory to understand options. Patterson also commented that they would "focus on performance." (Plaintiff's Exhibit 13.) Arnold's managers were focused on her performance because Schall was noticing the same performance issues with Arnold that Millichap had been observing, and Schall

perceived these to be systemic performance issues, not one-off mistakes here and there that are quickly rectified.  (Def. SOF ¶ 36.)

24. Later, after the Plaintiff was told that she would be issued a PIP, Tirado placed immense pressure on Arnold's leadership to pursue the PIP instead of the less severe Letter of Expectation. On February 18, 2020, before the PIP was issued, Arnold had requested a Letter of Expectation instead of the PIP since she had never received a rating lower than "Achieves". Arnold's leaders requested from Tirado more information on the Letter of Expectation, indicating that they were open to the idea, but Tirado convinced them to pursue the PIP instead. (Defendant's Exhibit D, Tirado Dep. p. 66:3-8; 71:2-13; Plaintiff's Exhibits 16, 17; Defendant's Exhibit A, Arnold Dep. p. 199: 4-11; Defendant's Exhibit C, Schall Dep. Vol II p. 98: 10-19).

**REPLY:**  Denied that Tirado put "immense pressure" on the leaders to put Arnold on a PIP rather than an LOE.  Tirado was merely "suggesting" that they move forward with a PIP, and expressed her opinion that in Arnold's case, they had "sufficient information to start moving forward with a PIP."  (Tirado Dep. at p. 66.)  There is no evidence that any of Arnold's leaders favored an LOE over a PIP, as Schall merely mentioned that Arnold had said something to her about an LOE and Schall asked if she could get more information on an LOE, to which Tirado replied, "Sure thing."  (Id.)  Tirado subsequently followed up by sending the team written information on the LOE and PIP processes and expressed her opinion that in Arnold's case, they had "sufficient information to start moving forward with a PIP."  (Tirado Dep. at p. 71.)  At her deposition, Schall explained the decision to issue Arnold a performance improvement plan, as opposed to some other action, as follows: "But we determined that in Mary Ann's case, because of the deficiencies that we were seeing, because of her need for so much structure and direction, that a performance improvement plan would be the best way to get her to the place that she needed to be most effectively and that moving forward with a performance improvement plan sooner rather than later would only help her. And that's why we made

the decision to put her on a performance improvement plan." (Def. SOF ¶ 39; Pl. Resp. to SOF ¶ 38.) Schall further testified that "because Mary Ann, you know, demonstrated over time this consistent need to have a lot of structure associated with anything that she did, a lot of clarity, as far as the direction, the performance improvement plan was deemed to be most helpful and supportive of her so that we could get her to a better place performance-wise in the organization". (Def. SOF ¶ 40; Pl. Resp. to SOF ¶ 39.) Ultimately, the final determination to list Arnold as partially meeting expectations and to put her on a performance improvement plan was made collaboratively by Schall, Patterson, Millichap and Reinglass. (Def. SOF ¶ 38; Pl. Resp. to SOF ¶ 37.)

25. During her deposition, Tirado also admitted that many of these conversations were held in person or on the phone in order to try to avoid creating a paper trail. (Defendant's Exhibit D, Tirado Dep. p. 40:20-23).

**REPLY:** Denied that this accurately describes Tirado's testimony. Tirado suggested at one point that matters be discussed over the phone based on her "best practices, it's more efficient and effective to communicate live through a discussion." (Tirado Dep. p. 30.) When asked if this was also a way to hide discussions that you're having about an employee, Tirado replied, "I can't answer that. That's not my practice." (*Id*. at p. 38.) When asked if that was part of the reason she suggested the parties talk in person, Tirado replied, "Again, I can't speculate other than to make sure that we're having effective communications so things don't get misinterpreted or lost in email communication" and that "based on my best practice as far as efficient and effective communication, I would assume based on my consistent behavior that I wanted to talk live so that the communication was more efficient." (*Id*. at pp. 38-39.) Later, in an email about Arnold's seating situation, Tirado indicated that she was "somewhat intentionally being vague via

email" because she wanted to make sure she had the conversation over the phone. (*Id.* at p. 41.) When asked whether this was in order to prevent there being a paper trail, Tirado did not say this was the case, but responded, "I'd be speculating, but maybe." (*Id.*)

26. Arnold's 2019 year-end review meeting was done by a team of Schall, Patterson, and Tirado. (Defendant's Exhibit A, Arnold Dep. p. 71:15-20).

    **REPLY:** Admitted.

27. At her 2019 year-end review, Arnold's review was simply read to her; she was not allowed to discuss it or to submit her self-assessment and Schall, who was reading the document, seemed visibly upset. (Defendant's Exhibit A, Arnold Dep. p. 73:17-21; 74-75:18-2).

    **REPLY:** Admitted that Arnold so testified and that was her alleged perception of Schall but denied that Arnold was not allowed to submit her self-assessment, which she testified was the initial part of the review. (Arnold Dep. at p. 73.)

28. Schall later admitted to Arnold that her previous supervisors and HR had pushed for the performance rating of "Partially Meets Expectations" and the PIP. (Defendant's Exhibit A, Arnold Dep. p. 200:21-24).

    **REPLY:** Denied that this accurately states Arnold's testimony. Arnold claims that Schall told her that she did not "initiate" or "trigger" her rating or a disciplinary performance issue, and that it was brought up by the previous team, because Arnold had only been reporting to Schall since September 3rd. (Arnold Dep. at pp. 200-201.) However, Schall testified that at the end of 2019 when Arnold reported to her, Schall was noticing the same performance issues with Arnold that Millichap had been observing, and Schall perceived these to be systemic performance issues, not one-off mistakes here and there that are quickly rectified. (Def. SOF ¶ 36.) Schall further testified that Arnold's performance at that time was "subpar, at very best" and Arnold "was kind of at the

bottom of the performance list in her job grade and across Corp Comm as a whole, even looking at everybody." (*Id.* at ¶¶ 37, 40.)

### Arnold's PIP

29. Schall's demeanor toward Arnold changed after the PIP was put in place. Prior to the PIP, Schall's tone in emails and in interactions with Plaintiff were light and friendly. Afterward Schall seemed increasingly annoyed with Arnold and was constantly nitpicking her work. (Exhibit H).

**REPLY:** Admitted that this may have been Arnold's perception, but denied that Schall became increasingly annoyed or was nitpicking Arnold's work or that such claims are supported by the cited record evidence.

30. Arnold was placed in a PIP without any formal performance coaching prior to the PIP being implemented. (Defendant's Exhibit A, Arnold Dep. p. 139:15-16).

**REPLY:** Denied. Arnold testified that there was "of course, communication and feedback around specific items, assignments, projects, et cetera. So I am not saying I didn't get any feedback from her." (Arnold Dep. at pp. 75-76.) Schall also had regular one-on-one meetings with all of her direct reports, including Arnold, as well as team meetings. (*Id.* at p. 76; Schall Dep., Vol. I, at p. 48.) Additionally, Arnold understood that the PIP process at United could be used at the discretion of her leader. (Def. SOF and Pl. Resp. to SOF ¶ 8.)

31. Arnold understood that unsuccessful completion of a PIP could result in termination. (Defendant's Exhibit A, Arnold Dep. p. 120:12-13). The Defendant's "Working Together Guidelines" regarding PIPs also indicated, "Employees who do not meet performance expectations will be subject to termination of employment." The Performance improvement plan also stated, "Failure to achieve expected behaviors and/or performance results will lead to disciplinary actions, up to and including termination." (Defendant's Exhibit A, Arnold's Dep., Dep Exhibit 2 at United 495 and Dep Exhibit 17 at Arnold 152).

**REPLY:** Admitted.

32. Arnold was expected to do not only her normal work, but also additional tasks as required by the PIP in order to succeed and keep her job. (Plaintiff's Exhibits 19-23; Defendant's Exhibit A, Arnold Dep. p. 119:16-19). Arnold was also continually micromanaged and held to unrealistic deadlines which made her work environment hostile. (Defendant's Exhibit A, Arnold Dep. 138:16-21; 141-142:18-6).

   **REPLY:**  Admitted that Arnold so testified as to her perceptions but denied that the PIP

   included any significant additional tasks that weren't part of Arnold's normal work.  The

   majority of the PIP issues related to Arnold's inability in her normal work to complete

   tasks on-time and accurately, which Arnold admits continued during the PIP period and

   as late as April 23, 2020, less than a month before she resigned.  (Def. SOF ¶ 50; Pl.

   Resp. to SOF ¶ 49.)  Further, the evidence does not support the notion that Arnold was

   micromanaged or held to unrealistic deadlines.  Rather, Arnold believed that if her

   manager had some constructive criticism, recommendations on how to do things better,

   or was critical of her performance, this was retaliatory because Arnold had engaged in

   protected activity.  *(*Def. SOF ¶ 29; Arnold Dep. at pp. 69-70.)

33. Most of the tasks required by the PIP were outside of her normal work and were still expected to get done on top of her normal workload in order to keep her job. (Defendant's Exhibit A, Arnold Dep. p. 119:16-19).  In addition, the language of the PIP itself was threatening as it indicated that if an employee failed to successfully complete the PIP, they could be subject to termination. (Defendant's Exhibit A, Arnold Dep at 120:10-13; Plaintiff's Exhibit 26). In addition, on May 15, 2020, Arnold received an email from Schall discussing the perceived issues with her PIP deliverables and telling her that they will be discussed the following week. (Plaintiff's Exhibit 24).

   **REPLY:**  Denied that most of the tasks required by the PIP were outside of Arnold's

   normal work (*see* Reply to ¶ 32 above, incorporated herein) and denied that the language

   of the PIP was threatening.  Moreover, at no time after Arnold was issued the PIP was

   she subjected to any disciplinary actions such as demotion, salary reduction, or

   termination of her employment.  (Def. SOF ¶ 42; Arnold Dep. at pp. 79-81.)

34. In addition, Arnold was held responsible for meetings that did not happen because her business partners rescheduled them despite the fact that she communicated these rescheduling's to her supervisor. (Plaintiff's Exhibits 25-26).

   **REPLY:** Denied that the record supports any notion that Arnold was "held responsible"

   for rescheduled meetings. Rather, in Arnold's April 23, 2020 PIP progress check-in

   document, with respect to the In the NOC rescheduled meetings, Schall stated that "even

   without feedback from Cheryl and Laura, there is still plenty of opportunity to do your

   own analysis, ASK ME for my thoughts on how to proceed and complete this piece, etc."

   and "the first I heard any update or feedback about this at all was on 4/8 as you were

   about to take a vacation on 4/13. With one week until the deadline and not even a

   meeting scheduled or update provided, my perspective is that this piece of the PIP has

   been handled very poorly overall." (Pl.'s Exhibits 25-26.) Further, in her own comments

   to the April 23, 2020 PIP progress check-in document, Arnold admitted to missing

   deadlines. (Def. SOF ¶ 51; Pl. Resp. to SOF ¶ 50.)

35. While on the PIP, Schall and Patterson repeatedly corrected Arnold in front of her business partners even after the business partners had approved and praised Arnold's work. (Defendant's Exhibit A, Arnold Dep. p. 145:6-22; 146:8-13, 146-147:23-22; 148:4-19; Plaintiff's Exhibits 27-28).

   **REPLY:** Denied that this accurately describes the record. Arnold testified that on a few

   occasions, Schall and Patterson made comments to Arnold about her performance on

   projects in email communications that included other United employees – the business

   partners involved in those projects. In these emails, Arnold acknowledges that her

   managers were saying things that Arnold could have done differently or improved on in

   her performance, but Arnold wished they had done so privately and outside of her

   business partners. (Def. SOF ¶ 68; Pl. Resp. to SOF ¶ 67.)

16

36. Despite her supervisors' contentions to the contrary, (Defendant's Exhibit C, Schall Dep. Vol. II pp. 113-114) Arnold completed everything required by the PIP.(Defendant's Exhibit A, Arnold Dep. p. 117:10-14).

    **REPLY:** Denied. It is undisputed that as of April 23, 2022, less than a month before the PIP period was set to end, Arnold had failed to complete numerous tasks associated with the PIP and had completed others late beyond deadlines. (Def. SOF ¶ 50; Pl. Resp. to SOF ¶ 49.) Additionally, as late as May 15, 2020, Arnold was still submitting PIP deliverables late. After receiving those late deliverables, Schall wrote the following in an email to Arnold: "Yes, I have received these materials, Mary Ann. Thank you. The issue with these, and what remains consistent across most of the PIP tasks, is that deadlines are either not met (the project tracker/Trello board solution, for instance was due the week of March 1 – not May 8) or barely met (ex. delivery occurs late and usually only after reminders), and these are areas where we remain significantly concerned. We'll share our final feedback on the PIP deliverables next week." (Def. SOF ¶ 52; Pl. Resp. to SOF ¶ 51.) In response to that mail, Arnold submitted even more last second PIP deliverables, and Schall replied in an email dated May 20, 2020, "I will look at this today and ensure your feedback is considered in our final PIP decision." (Schall Dep., Vol, II, at p. 112.) That same day, Arnold voluntarily resigned before the final PIP meeting. (Def. SOF ¶¶ 54-55; Pl Resp. to SOF ¶¶ 53-54.)

37. Arnold's final PIP meeting that would determine whether United considered the PIP successful and next steps was rescheduled from its original date of May 8 to the 15th on May 11, 2020, and then again rescheduled On May 14 to May 21, 2020. The final meeting was never held. (Defendant's Exhibit C, Schall Dep. Vol II pp. 109-110:10-6).

    **REPLY:** Admitted that the final PIP meeting may have been rescheduled due to other conflicts relating to business and operational needs. (Schall Dep., Vo. II, at pp. 109-110.)

17

Admitted that the final meeting was never held because Arnold voluntarily resigned

before it could be held. (Def. SOF ¶¶ 54-55; Pl Resp. to SOF ¶¶ 53-54.)

38. During the process of her PIP, and despite interference by Tirado, Arnold repeatedly reached out to the higher-ups to attempt to complain about the mistreatment she was receiving. Beth Nettles allegedly investigated her claims by speaking to all of the stakeholders about the Plaintiff's Complaints and told the Plaintiff that she found that everything was done correctly. (Id.) Genesis Tirado also interfered with Arnold's attempt to escalate her concerns by refusing to provide Arnold with the information that she needed to appeal her performance review and PIP (Plaintiff's Exhibits 9).

**REPLY:** Denied that these allegations are accurately supported by the record and denied

that Arnold was subjected to any "mistreatment" or that Tirado "interfered" with any

attempts by Arnold to raise any concerns. Admitted that after Tirado had given her point-

by-point response to Arnold's concerns, Arnold complained to Beth Nettles, who

investigated the matter further and sent Arnold an email dated May 5, 2020, which stated

in part, "I have reviewed all documentations surrounding your performance reviews, your

current PIP, and have spoken to all the appropriate stakeholders regarding your concerns.

I have found no evidence to support that your 2019 performance assessment was unjust

or unfair. The decision has been made to keep your rating at Partially Meets. Please

continue to work with your leader and Human Resources Business Partner to strengthen

the areas of opportunities identified in your PIP. Although this may not be the response

you were seeking, I trust that you understand that United is committed to maintaining the

highest ethical standards in every aspect of our business. We appreciate you bringing this

matter to our attention and thank you for your patience as we looked into your concerns."

(Tirado Dep. at p. 79; Pl. Ex. 8.) Further, denied that Tirado in any way interfered with

Arnold's attempts to escalate her concerns. On February 21, 2020, after she received the

"partially meets" performance review and was put on a PIP, Arnold sent an email to

Tirado that stated in part: "Based on the Working Together Guidelines, could you please provide the appeal process for management around unfair performance rating and incorrect said rating on accelerated disciplinary and skipped levels, immediately?" By response email dated February 24, 2020, Tirado accurately stated: "There is no policy that outlines what you describe below in regards to perceived accelerated disciplinary and skipped levels of discipline. Each performance-related issue is handled on a case by case basis, in collaboration with the employee's leader, HR Partner and in some cases Legal." After receiving Ms. Tirado's response email, Arnold understood that each performance-related issue at United is handled on a case-by-case basis. (Def. SOF and Pl. Resp. to SOF ¶¶ 10-11.)

39. Both Schall and Tirado denied being interviewed by Ms. Nettles as part of her investigation (Defendant's Exhibit C, Schall Dep. Vol II p. 85:8-12; 87:8-15, Defendant's Exhibit D, Tirado Dep. pp. 43-44:20-11).

   **REPLY:** Denied. Schall did not recall speaking to Nettles, but Tirado recalled that she did speak to Nettles regarding her investigation. (Schall Dep., Vol. II, at p. 87; Tirado Dep. at p. 82.)

40. As a result of the PIP, the increased heavy workload it brought above and beyond her normal workload, the constant scrutiny and public correction by Schall and Patterson, being blamed for her business partners rescheduling meetings, the unrealistic expectations that Arnold would have to meet in order to be deemed successful in the PIP, the multiple rescheduling's of her final PIP meeting which would determine whether or not Arnold got to keep her job, and the refusal of upper management and HR to help remedy the harassment, Arnold was constructively discharged on or about May 20, 2020 when she retired. (Defendant's Exhibit A, Arnold Dep. at pp. 115-116, 138:16-21, 141-142:18-6, 145:6-22, 146:8-13, 146-147:23-22; Arnold Dep Exhibit 26 at Arnold 257; Defendant's Exhibit C, Schall Dep. Vol II pp. 109-110:10-6; Plaintiff's Exhibits 25, 26, 27, 28).

   **REPLY:** Admitted that these allegations may reflect Arnold's subjective perceptions, but as provided in various replies above, denied that the PIP added a heavy workload beyond

Arnold's normal workload (see Reply ¶ 32, incorporated herein), denied that Arnold's managers subjected her to constant scrutiny or public correction, that Arnold was blamed for any rescheduling of meetings or given unrealistic expectations (*see* Reply ¶¶ 34-35, incorporated herein), denied that any rescheduling of the final PIP meeting was due to anything other than normal conflicts relating to business and operational needs (see Reply ¶ 37, incorporated herein), and denied that HR or upper management refused to help remedy the alleged harassment.  As noted, United investigated and found no merit in Arnold's 2017 age discrimination complaint or her 2018 complaint about Stephen Jones, but United nevertheless changed Arnold's reporting relationship and seating location, it further investigated her concerns after the reorganization and Tirado sent her a point-by-point response to each of her complaints, Arnold was given a better seating solution after contacting Garrison Phillips, and Beth Nettles further investigated her claims and found them to be without merit.  (*See* Reply ¶¶ 15, 18 and 38, incorporated herein.) Additionally, at her deposition, Arnold did not cite all of these factors as being the reason she believes she was constructively discharged.  (Def. SOF ¶ 57; Pl. Resp. to SOF ¶ 56.) In any event, the contention that Arnold was constructively discharged is a legal question to be resolved by the Court.

### Disparate Treatment of Arnold versus the Co-worker

41. In her deposition, Schall admitted that she had not given a below achieves rating to any subordinate other than Arnold during her time with United. (Defendant's Exhibit B, Schall Dep. Vol. I pp. 14-15:22-4).

**REPLY:**  Admitted.  However, Schall testified that at the point she gave Arnold the "partially meets" rating, Arnold's work performance was "subpar, at very best" and Arnold was "just the clear, kind of outlier, as far as – you know, she was kind of at the

bottom of the performance list in her job grade and across Corp Comm as a whole, even looking at everybody." (Def. SOF ¶¶ 37, 40.)

42. Schall also admitted during her deposition that she did not give a PIP to anyone but Arnold during her time at United (Defendant's Exhibit B, Schall Dep. Vol. I p. 15:17-20).

**REPLY:** Admitted. (*See* Reply to ¶ 41 above, incorporated herein.)

43. The reasons given to Arnold for the PIP included her lack of attention to detail and her failure to meet deadlines. (Defendant's Exhibit C, Schall Dep Vol II pp. 89-90:20-8).

**REPLY:** Admitted in part. In describing the reasons for the PIP, Schall also testified as follows: "Ability to meet deadlines. The amount of editing – you know, we're a group in corporate communications, a group of writers. The amount of editing that had to go into the content that she was generating. The amount of direction and redirection that she needed. The amount – you know, the amount of times that, you know, she would be assigned something and need to be reminded to get it done. All of this is reflected in the performance review and as far as what we were seeing in terms of the deficiencies versus what we would expect members of our team to be able to accomplish as functional members of a corporate Communications organization." (Schall Dep., Vol. II, at pp. 89-90.)

44. Once pressed during her deposition, Schall also admitted that The Comparable Coworker also missed deadlines but was not put on a PIP. (Defendant's Exhibit C, Schall Dep. Vol. II p. 123:1-9).

**REPLY:** Admitted that the Coworker was not put on a PIP, and that Schall testified that "there may have been a time that [the Coworker] missed a deadline, but her handling of it was very different than Mary Ann's handling of it." (Schall Dep., Vol. II. at p. 123.) Schall further testified that the Coworker also missed deadlines at times, but she was communicative with Schall about making adjustments and reestablishing deadlines. (*Id*.

at p.121.)  By contrast, another performance deficiency of Arnold's was not being good at communicating about changes to a plan, reestablishing the plan. (*Id*.)

45. In addition, The Comparable Coworker;s 2019 year-end review contained much of the same criticisms levied against Arnold including her lack of attention to detail and inability to be flexible (Plaintiff's Exhibit 30, p. United 3189).

**REPLY:**  Denied that the Coworker's year-end review and job performance was comparable to Arnold's.  With respect to the differences in performance between Arnold and the Coworker, Schall testified that at the end of 2019, Schall participated in a calibration process where the performance of her direct reports was considered, including Arnold and the Coworker who were both at Level 5.  (Schall Dep. Vol. II at pp. 73-74.)  In making her assessments of Arnold and the Coworker, Schall looked at prior performance reviews for Arnold and the Coworker and had conversations with their prior managers, as Arnold and the Coworker had only started reporting to Schall in September 2019. (*Id*. at pp. 74-77.)  For her year-end performance evaluation in 2019, the Coworker received an overall rating of "meets expectations" and was not put on a performance improvement plan because PIPs are not used for employees who are meeting expectations. (*Id*. at pp. 78-79.)  Schall did note some issues the Coworker had with her overall attitude and demeanor when she got last minute requests on assignments.  However, the Coworker took that feedback and made positive changes. (*Id*. at pp. 75-76.)  The Coworker also missed deadlines at times, but she was communicative with Schall about making adjustments and reestablishing deadlines. (*Id*. at p.121.)  By contrast, another performance deficiency of Arnold's was not being good at communicating about changes to a plan, reestablishing the plan. (*Id*.) The performance issues that Schall and the other managers were seeing with Arnold were systemic issues

that Arnold repeated over and over consistently over time. (*Id*. at pp. 121-122.)  These

kinds of systemic performance issues were not observed with the Coworker. (*Id*. at p.

122.)

46. In addition, all of the outcomes listed in The Comparable Coworker's year-end review were considered delayed and not overdue despite not being completed by the end of the year as was expected in the review. (Plaintiff's Exhibit 30, pp. United 3185-3186).

   **REPLY:**  Denied that the record supports this contention or that Arnold's performance

   was comparable to the Coworker's.  (*See* Reply to ¶ 45 above, incorporated herein.)

47. Despite having similar feedback to Arnold and failing to complete any of her year-long goals, The Comparable Coworker was given an "Achieves Expectations" instead of a "Partially Achieves" expectation in her review and was not placed on a PIP. (Plaintiff's Exhibit 30, pp. United 3181-3189).

   **REPLY:**  Admitted that the Coworker was given an "Achieves Expectations" rating and

   was not put on a PIP but denied that they had similar feedback or that Arnold's

   performance was comparable to the Coworker's.  (*See* Reply to ¶ 45 above, incorporated

   herein.)

48. Neither Schall nor Tirado were aware of any complaints made by The Comparable Coworker.  (Defendant's Exhibit C, Schall Dep Vol. II at 83-84; Defendant's Exhibit D, Tirado Dep. At 104).

   **REPLY:**  Admitted.

Dated:  December 7, 2023                          Respectfully submitted,

                                                  By:  /s Alan S. King_____
                                                  Alan S. King, Esq. (ARDC #06198223)
                                                  Noreen H. Cull, Esq. (ARDC # 06229417)
                                                  Jasmine D. Morton (ARDC No. #6321171)
                                                  RILEY SAFER HOLMES & CANCILA LLP
                                                  70 West Madison Street, Suite 2900
                                                  Chicago, Illinois 60602
                                                  Telephone: 312.471.8700
                                                  aking@rshc-law.com
                                                  ncull@rshc-law.com