## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MARY ANN ARNOLD,         )
                                )
                Plaintiff,     )
                                )
            v.               )      22 C 405
                                )
UNITED AIRLINES, INC.,      )
                                )
               Defendant.    )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Plaintiff Mary Ann Arnold brings this action against her former employer, Defendant United Airlines, Inc. ("United"), alleging unlawful discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA") and the Illinois Human Rights Act ("IHRA"). Before the Court is United's motion for summary judgment on all claims. For the following reasons, the motion is granted.

## BACKGROUND

In resolving United's motion for summary judgment, the Court views the evidence in the light most favorable to Arnold as the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are undisputed except where noted. Any asserted facts or factual disputes that were not supported by evidence or were immaterial or otherwise inadmissible have not been included.

Arnold was hired by United on or about March 14, 1994, and left the company on May 20, 2020.[1]  Prior to a reorganization of United's corporate communications functions in September 2019, Arnold was part of a communications group responsible for internal United communications relating to airport operations.

Arnold made multiple complaints while working for United.  The first was in 2017 for age discrimination and failure to promote based on disability.  Arnold filed this complaint internally with United, which stated it could not substantiate her claims, and with the Illinois Department of Human Rights, where she later withdrew the complaint.

The second complaint was in July 2018, against her then-supervisor Steven Jones, for sexual harassment.  Arnold first submitted the complaint anonymously, but later resubmitted it using her own name in late September 2018.  United investigated and was unable to substantiate Arnold's claims.[2]

Arnold received her mid-year performance review for the period from January 1, 2018, to June 30, 2018, from Jones.  Jones gave Arnold an overall rating of "on track with peers."  Arnold does not know whether her 2018 mid-year review was completed by Jones before or after she made her 2018 anonymous complaint against him.  She

---

[1]  The parties dispute whether Arnold "voluntarily retired," "involuntarily retired," or was "constructively discharged."

[2]  Importantly, Arnold's claims in this case are not about the events that lead to the complaints, they are about Arnold's belief that she was retaliated against for making the complaints.

also does not know whether her meeting with Jones about the mid-year review took place before or after her complaint.

In December 2018, Arnold was allowed to begin reporting to Stephanie Millichap as an accommodation in connection with her sexual harassment complaint against Jones. Millichap gave Arnold her 2018 year-end review, but because Arnold had then been reporting to her for less than a month, Millichap conferred with Jones on the evaluation and allegedly told Arnold that most of the notes came from Jones's mid-year review and his notes of her performance.

In her 2018 year-end performance review, Millichap gave Arnold an overall rating of "Achieves." Arnold does not know whether the "Achieves" rating was determined by Millichap or Jones or through collaboration between the two of them.

In her comments in Arnold's 2018 year-end review, Millichap wrote in part:

> Mary Ann I'd like to see you take [a] more assertive role and proactively build strategic comms plans that include channels, timing, messaging, context/background and measurement. The projects we work on can be very complex and ambiguous, but part of our role is to seek out information and create structure and understanding for our frontline. Don't wait for your stakeholders to give you what you think you need; take the information you have, put it in the context of what you know about your audience, and create content that helps connect the dots. You have a passion for making sure the frontline gets what they need to be effective in their jobs, but you need to be proactive in identifying and solving the problems so that our business partners can achieve that goal.

Dkt. # 46, ¶ 24.

Arnold believes her 2018 year-end review was retaliatory because it referenced Jones's mid-year review. Arnold further believes that if Millichap had some areas that

she thought Arnold could improve on or had some criticisms of her performance, this is because of retaliation because Arnold had engaged in protected activity by complaining of sexual harassment.

Millichap gave Arnold her 2019 mid-year review and rated her as "on track with peers." However, in the mid-year review, Millichap noted the following performance issues and areas for improvement:

> Over the next six months, Mary Ann should focus on how she builds plans, creates timelines, sticks to deadlines and communicates progress. This type of end-to-end project ownership and leadership takes practice but is such a critical skill to be successful on the communications team and in the organization as a whole. More specifically proactively seeking information and answers, creating structure, setting deadlines and following up with your partners in order to get things done.

Dkt. # 46, ¶ 27. Millichap further wrote: "An additional area of focus is to develop your presentation skills and executive presence. This goes hand-in-hand with successful updates to key stakeholders and leaders." *Id.*

Arnold believes that if her manager had some constructive criticism, recommendations on how to do things better, or was critical of her performance, this was retaliatory because Arnold had engaged in protected activity.

Effective September 3, 2019, United reorganized its corporate communications functions and moved them under the umbrella of its Corporate Communications department. As part of that reorganization, Arnold and her entire team, as well as other communications employees, were moved under Corporate Communications.

4

Arnold and a co-worker[3] from her prior team (the "Coworker") began reporting to Courtney Schall, who reported to Laura Patterson, Director of Operations Communications. Following the reorganization and for the remainder of her employment at United, Arnold's position was Senior Writer in the Corporate Communications department. Compared to her previous role in communications in Airport Operations, some of Arnold's roles and responsibilities changed but the basic functions of those positions were the same in that they both dealt with internal corporate communications.

In a meeting before she officially started reporting to Schall, Arnold told Schall about her 2018 sexual harassment complaint against Jones, which Schall had not been previously aware of. Schall is unaware of Arnold's 2017 age discrimination complaint.

Arnold testified that as part of the reorganization, a "major project" known as the "Core4 project" was taken away from her and given to a younger employee, whose age and level of experience are unknown. United denies this was a "major project" and, according to Patterson, the project was essentially complete at the time of the reorganization. Patterson stated that as part of the reorganization, a new team was created and charged with managing communications for large integrated campaigns and projects that spanned across many operations teams. She added responsibility for any remaining Core4 tasks (along with multiple operations-wide projects that Arnold

---

[3] At all relevant times, both Arnold *and* the Coworker were over the age of 40. The Coworker is less than seven years yournger than Arnold. The Coworker was born in 1975 and Arnold was born in 1968.

was not a part of) to that team. Patterson testified that at the time of the reassignment, she was unaware of and did not consider Arnold's age or the age of any of the new team members.

Arnold had specific conversations with both Schall and Patterson regarding her discomfort with Jones. Schall was supportive; Patterson said she would do everything she could to keep the two apart but that she could not guarantee to keep the two apart as they "had a job to do." Dkt. # 54, ¶ 13.

Following the reorganization, despite making her discomfort with Jones known to her supervisors, Arnold was directed to move floors, into a cubicle that she perceived to be "right near" Jones. United denies Arnold was ever asked to sit "right near" Jones. Arnold complained to Human Resources Manager Genesis Tirado about the seating arrangement and testified that in a phone call between herself and Tirado's boss, Preet Michelson, Michelson told her that she would need to sit with the team and also said that Arnold would need to decide if working here long term was going to work for her. United denies the "working here" comment was made during this conversation. Arnold escalated the issue to Garrison Phillips, a member of United's legal team. Arnold testified that she "was able to get a better seating solution on the floor but outside the direct area" after she contacted Phillips. Dkt. # 54, ¶ 15.

Arnold alleges that after switching teams due to the reorganization, the projects she was given had far less visibility and partner interaction, even though her business partners had all praised her work on the Core4 project and were confused when she

6

was taken off the project. Arnold also testified that she was given a lot more work despite reaching out to try and alleviate the pressure.

Tirado testified that in a meeting with Millichap prior to the reorganization, and before Arnold began reporting to Schall and Patterson, Millichap informed Tirado that she (Millichap) was having performance concerns with Arnold. Millichap told Tirado that she had pretty consistently coached Arnold on performance issues and was not seeing improvement. Arnold denies that she was given proper performance coaching.

After Arnold began reporting to Schall, Schall noticed the same performance issues that Millichap had observed, and Schall perceived these to be systemic performance issues, not one-off mistakes here and there that could be quickly rectified. However, Arnold testified that Schall gave very little feedback about her performance and the feedback she did receive was positive.

In an October 2019 email exchange between Patterson, Tirado, Michelson, and Patterson's supervisor Dana Reinglass, Patterson inquired about whether there were options to offer Arnold a package. Tirado replied, "What is the rationale for providing her a package? What message are we sending by providing her an option to leave (especially if she has not shared she wants to leave)." Dkt. # 47-13, at 2. Patterson clarified that her question was exploratory to understand available options. Ultimately, it was decided that they would "focus on performance." *Id.* at 1.

In an email about Arnold's seating situation, Tirado indicated that she was "somewhat intentionally being vague via email" because she wanted to make sure the

conversation took place over the phone. Dkt. # 54, ¶ 25. When asked whether this was in order to prevent there being a paper trail, Tirado responded, "I'd be speculating, but maybe." *Id.*

As of the end of 2019, it was Schall's assessment that Arnold's work performance was "subpar, at very best." Dkt. # 46, ¶ 36. At her deposition, Schall described why she referred to Arnold's performance as subpar as follows:

> Ability to meet deadlines. The amount of editing – you know, we're a group in corporate communications, a group of writers. The amount of editing that had to go into the content that she was generating. The amount of direction and redirection that she needed. The . . . amount of times that, you know, she would be assigned something and need to be reminded to get it done. All of this is reflected in the performance review and as far as what we were seeing in terms of the deficiencies versus what we would expect members of our team to be able to accomplish as functional members of a corporate communications organization.

*Id.* ¶ 39.

Near the end of 2019, Schall had a collaborative discussion with Patterson, Millichap, and Reinglass about Arnold's performance versus other similar individuals on the team at the same job level and what to do about Arnold's more pronounced level of deficiency and how to fix it. The determination made collaboratively by Schall, Patterson, Millichap, and Reinglass was to list Arnold as partially meeting expectations and to put her on a Performance Improvement Plan ("PIP"). Prior to this review, Arnold had not received a rating below "Achieves" during her time at United (with the exception of the "on track with peers" ratings in her mid-year reviews).

In Arnold's 2019 year-end review, Schall wrote in part:

Mary Ann's areas for strengthening all fall within the Deliver Results dimension including the following competencies Accountability, Agility, and Execution. Mary Ann does not consistently demonstrate the ability to define expectations (deadlines in particular) and see those are met without much hardship. It seems difficult for Mary Ann to intake a project/change and clearly convey such a change to a broader group. Instances include PetSafe changes and proactive compensation changes, which have become problematic more broadly. Additionally, straightforward requests (like an editorial calendar/IntheNoc) often require numerous follow-ups over several months before work is executed. Despite deadlines with long runways and regular check-ins on progress to ensure Mary Ann is managing her assignments. [H]er work regularly comes together at the last minute. Even when final deadlines are met, this delayed output impacts (or is a burden to) her manager and peers during the review process. . . . Overall, during the Corp Comm re-organization, Mary Ann's ability to adjust, understand expectations and add value, was well behind her peers.

Dkt. # 46, ¶ 33. Arnold denies the truth of these comments and maintains that she consistently drove projects forward, including taking on new projects, and met deadlines as required by her job.

In February 2020, Arnold was issued a PIP. During her employment at United, Arnold was familiar with United's Working Together Guidelines ("WTGs") that contained the PIP policy, which states in part as follows:

Employees who do not meet performance expectations at either Mid-year or year-end will work with his/her leader to develop a plan that maps out a path to successful performance. The employee will be expected to meet the requirements outlined in the PIP within a specified time-frame. Employees who do not meet performance expectations will be subject to termination of employment. The above process will also apply to employees who partially meet expectation[s] at year-end two years in a row or at the discretion of the leader.

Dkt. # 46, ¶ 7. Arnold knew that a rating of "partially meets" did not require or dictate a PIP, but she understood that the PIP process at United could be used at the discretion of her leader.

At her deposition, Schall explained that they made the decision to issue the PIP instead of some other corrective action because of the deficiencies they were seeing and Arnold's demonstrated need for a lot of structure and direction, and a PIP would be the best way to get Arnold to the place that she needed to be most effective.

The PIP described Arnold's performance deficiencies, plans for improving her performance, and consequences if performance expectations were not met during the 60-day PIP period. The PIP stated in part: "Immediate and sustained improvement is expected to improve your current performance rating of 'partially meets expectations'; further disciplinary action up to and including termination could result. Failure to achieve expected behaviors and/or performance results will lead to disciplinary actions, up to and including termination." Dkt. # 46, ¶ 41.

With respect to what her managers included in the PIP under performance deficiencies and behavioral/skill deficiencies, Arnold testified she could not recall whether those deficiencies were legitimate. She personally believed, however, that her performance was way better than the way her managers were assessing it.

Arnold asked Patterson and Schall if she could get a "Letter of Expectation" instead of being put on a PIP. This request was relayed to Tirado, Preet, and Reinglass. Schall and Patterson admitted to the others that they were unfamiliar with letters of

10

expectation and asked Tirado for more information about the process. Tirado recognized that there was some discretion to move forward with a letter of expectation instead of a PIP; however, Tirado concluded that, based on the recent performance issues Arnold had consistently been exhibiting, she was comfortable moving forward with the PIP.

Arnold maintains that Tirado put substantial pressure on her supervisors to issue a PIP instead of a letter of expectation. She reached out to Tirado and asked about the appeal process "for management around unfair performance rating and incorrect said rating on accelerated disciplinary and skipped levels." Dkt. # 54, ¶ 38. Tirado explained that each performance-related issue is handled on a case-by-case basis.

At no time after Arnold was issued the PIP was she subjected to any disciplinary actions such as demotion, salary reduction, or termination of her employment.[4]

During the PIP period, Schall and Patterson met periodically with Arnold to discuss her performance and how she was progressing with the PIP, and Schall continued to have one-on-one meetings with Arnold. Arnold continued to have performance deficiencies during the PIP period. For example, Schall and Patterson had a PIP progress check-in meeting with Arnold on April 23, 2020, and Schall sent an email later that day recapping the meeting. The recap of the PIP progress check-in included the following points:

---

[4] Arnold maintains that she was constructively discharged on May 20, 2020, when she retired.

11

(a) an incident in which Arnold submitted an assignment late in the day on February 24, 2020, with revisions still needed;

(b) certain March content was due on March 23rd or 24th, but Arnold did not provide it until 8:00 p.m. on March 29th, with significant edits still needed such that the final message went out very late on March 31st;

(c) a leader message that Arnold was requested to provide for a business partner in early April, with Schall noting that the process did not kick off until after a reminder from Schall to Arnold on April 14th to generate a draft message, with the final message being sent on April 17th, well beyond the agreed-upon early month deliveries for the business partner's message;

(d) An initial draft of another brief leader message was due by March 6, so that a draft could be sent for review by March 9th or 10th in advance of a targeted March 11th deployment date, where Arnold failed to provide the draft;

(e) Arnold submitted a distribution list resource document to Schall on-time on March 13th but there were still many holes to fill and adjustments to be made, and another member of the team had to take this on and saw it through to completion;

(f) Arnold had not submitted on-time delivery of Thursday updates beyond a single slide;

(g) Arnold had not by then identified any training opportunities to improve her presentation skills as requested;

(h) Arnold had by then started but not completed a requested project-tracker that was to be used to review her project progress and workload each week; and

(i) Arnold had not by then scheduled additional 1:1 sessions with Schall and Patterson to discuss personal development and progress nor provided an agenda for such meetings as requested.

Dkt. # 46, ¶ 49.

Arnold perceived a change in Schall's demeanor towards her after the PIP was put in place. While prior interactions were light and friendly, Schall seemed to get

increasingly annoyed with Arnold and was constantly "nit-picking" her work. Schall and Patterson made a few comments to Arnold about her performance on projects in email communications that included other United employees, including how Arnold could have done something differently or improved on her performance.

Arnold states she repeatedly reached out to the higher-ups to complain about the mistreatment she was receiving. In response to Arnold's email to the Executive Vice President of Human Resources and Labor Relations, Beth Nettles, Director of Employee Relations, informed Arnold that she reviewed the documentation pertaining to Arnold's performance reviews and the PIP and spoke with the appropriate stakeholders about Arnold's concerns. Nettles stated that she had found no evidence to support Arnold's complaint that her 2019 performance review was unjust or unfair. Schall did not recall speaking to Nettles, but Tirado remembers speaking to Nettles about her investigation.

United and Arnold disagree about whether Arnold successfully completed her PIP. United maintains that the PIP was not successfully completed because there were things Arnold completed very late, at the last minute, and other things she did not complete at all. Arnold denies anything was incomplete.

The meeting during which Schall and Patterson were to give their final feedback to Arnold on the PIP deliverables was supposed to take place on May 8, 2020, but the meeting was rescheduled twice to May 21, 2020. However, the meeting never took place because on May 20, 2020, Arnold sent an email to Schall and Patterson that stated:

"Team, This will serve as my official notice of my involuntary retirement. My last day will be Tuesday, June 2. I'll be wrapping up all of my work over the next week so let me know who will absorb my work so I may advise my business owners for a seamless transition. Thanks, Mary Ann Arnold." Dkt. # 46, ¶ 54.

Prior to Arnold sending her May 20, 2020 email, no one at United, including Schall, Patterson, or human resources personnel, ever told Arnold that she was discharged or was going to be discharged from United. Arnold, however, believes she was "constructively discharged."

Arnold believes that she was treated more harshly than the Coworker, who demonstrated some of the same performance issues as Arnold, including missing deadlines. Schall testified that she had not put an employee on PIP prior to Arnold. When questioned about the Coworker's performance at her deposition, Schall testified that there may have been times that the Coworker missed deadlines, but the Coworker's handling of it was very different than Arnold's handling of the same issue. Schall testified the Coworker was communicative about adjusting and reestablishing deadlines, something Arnold did not do.

The Coworker received an overall rating of "meets expectations" in her 2019 year-end performance review. Schall noted some issues the Coworker had with her overall attitude and demeanor when she got last minute requests on assignments; however, the Coworker took that feedback and made positive changes. Neither Schall nor Tirado were aware of any complaints made by the Coworker.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

Arnold brings claims for age discrimination and retaliation under the ADEA and the IHRA, and constructive discharge under Illinois law. In her response to United's motion for summary judgment, Arnold also raises a hostile work environment claim. "The Seventh Circuit applies the same overall analysis to claims under Title VII, the ADEA, and the IHRA." *Gray v. Arrow Elecs., Inc.*, 2019 WL 1399945, at *3 (N.D. Ill.

15

2019) (citations omitted).  Because the legal standards are the same, if Arnold ultimately fails to prove her ADEA claims, her IHRA claims will necessarily fail as well; if she prevails on her ADEA claims, so too will she prevail on her IHRA theory.  *See Huber v. Fox Valley Park Dist.*, 2021 WL 1546425, at *5 (N.D. Ill. 2021).

## I.     Age Discrimination Claims

"The ADEA protects workers 40 years of age and older from age-based employment discrimination."  *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018).  At summary judgment, we ask whether a reasonable jury could conclude Arnold's age was the cause of the alleged adverse employment actions.  *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016).  "'[I]n the ADEA context, it's not enough to show that age was a motivating factor.  The plaintiff must prove that, but for [her] age, the adverse action would not have occurred.'"  *Hoffberg v. Elliot Auto Supply Co., Inc.*, 2024 WL 245186, at *6 (N.D. Ill. 2024) (quoting *Martino v. MCI Commc'ns Serv., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009)).

There are two frameworks a plaintiff can use to show discrimination.  Under the holistic approach established in *Ortiz*, the evidence is viewed in the aggregate to determine whether it allows an inference of prohibited discrimination.  834 F.3d at 765.

Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff must first establish a prima facie case for discrimination.  This requires a showing that: (1) she was over forty years of age; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse

employment action; and (4) similarly situated, substantially younger employees were treated more favorably." *Cabrera v. Advance Pallet, Inc.*, 2023 WL 6276542, at *3 (N.D. Ill. 2023) (citing *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771–72 (7th Cir. 2002)). "The law defines substantially younger as 'generally ten years younger.'" *Torbica v. Horizon Bank*, 2023 WL 7214939, at *5 (N.D. Ind. 2023) (quoting *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 322 (7th Cir. 2003)).

Once the plaintiff establishes her prima facia case, the burden then shifts to the employer to present a "legitimate, non-discriminatory reason" for the employment decision. *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 574 (7th Cir. 2021) (quoting *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016)). If the employer presents a legitimate reason, the burden shifts back to the employee to show the proffered reason is a pretext for discrimination. *Id.* "The defense bears the burden of articulating the justification, but the plaintiff bears the burden of showing that the justification is a pretext." *Sterlinski v. Catholic Bishop of Chi.*, 934 F.3d 568, 571 (7th Cir. 2019).

The parties agree that, at all relevant times, Arnold, as an individual over the age of 40, was a member of the class sought to be protected by the ADEA. The parties disagree, however, as to whether Arnold (1) suffered an adverse employment action, (2) was meeting legitimate performance expectations, and (3) was treated worse than similarly situated employees.

In support of her age discrimination claim, Arnold argues she suffered two adverse employment actions: being taken off the Core4 project and shifted to projects that had less visibility and interaction with partners, and being placed on the PIP.

At the outset, we conclude that neither of these actions qualify as adverse employment actions. An adverse employment action must be "one that is materially adverse, meaning more than a mere inconvenience or an alteration of job responsibilities." *Atanus v. Perry*, 520 F.3d 662, 678 (7th Cir. 2008) (quoting *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002)). The Seventh Circuit has stated time and time again that "not everything that makes an employee unhappy is an actionable adverse action." *Reives v. Ill. State Police*, 29 F.4th 909, 911 (7th Cir. 2022) (quoting *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007)) (cleaned up).

Even if the reassignment of the Core4 project constituted an adverse action, United has offered a legitimate, non-discriminatory reasons the reassignment. Patterson explained that, as part of the reorganization and for efficiency purposes, a newly-created team was charged with managing projects that spanned across many operations teams (as opposed to just one team). The Core4 project was largely complete, and Patterson assigned responsibility for any remaining Core4 tasks, along with other operations-wide projects that Arnold was not involved with, to the new team. Patterson also stated she did not consider the ages of the team members in making decisions regarding the reorganization and reassignment of Core4 tasks. We agree with United that Arnold

18

offers no evidence to call into question these facts. She merely cites her own belief that someone younger was assigned the Core4 project—but does not offer any evidence of that individual's age. Arnold also points out that certain unidentified business partners had praised her work and were allegedly confused by her removal from the project. This fact does nothing to undermine or call into question Patterson's explanation for the reassignment.

As for the PIP, "negative performance reviews and performance improvement plans" do not "constitute adverse employment actions." *Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 626 (7th Cir. 2019) (citations omitted); *see also Swenson v. Bd. of Educ. of City of Chi.*, 2023 WL 4352104, at *4 (N.D. Ill. 2023) ("'[A] negative evaluation or admonishment by an employer does not rise to the level of an adverse employment act.'") (quoting *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004)); *Saggu v. DeJoy*, 2021 WL 1165106, at *11 (N.D. Ill. 2021) ("Employers are generally free to micro-manage and require as much petty communication as they wish.") (cleaned up); *Fidishin v. Gary Cmty. Sch. Corp.*, 2022 WL 326544, at *10 (N.D. Ind. 2022) (performance critiques, "even if the Plaintiff found them unwarranted," and "getting the cold shoulder from a supervisor" did not impose an objective hardship on the plaintiff and so did not qualify as adverse employment actions).

In any event, if the employer raises the employee's performance as the reason for the adverse employment decision, the Court can skip the prima facie analysis and proceed directly to pretext, because issues of pretext and satisfactory performance

19

overlap. *Vichio v. United States Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023); *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023). "Pretext does not require that plausible facts presented by the defendant not be true, only that they not be the reason for the employment decision." *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1045 (7th Cir. 2000).

The Seventh Circuit has stated "in more than one hundred reported opinions" that a district court is "not a super-personnel department that [can] substitute [its] criteria for an employer's for hiring, promoting, or disciplining employees." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 933 (7th Cir. 2020) (citations omitted). Rather, in order to determine whether Arnold was meeting United's legitimate expectations, we must look at her job performance through the eyes of her supervisors at the time of the alleged adverse action. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 310 (7th Cir. 2012). "It is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee." *Ineichen v. Ameritech,* 410 F.3d 956, 961 (7th Cir. 2005) (cleaned up). "'The question is not whether the [employer's performance] ratings were *right* but whether the employer's description of its reasons is *honest.*'" *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 574 (7th Cir. 2021) (quoting *Gustovich v. AT & T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992)).

Here, Schall testified that Arnold's performance at the end of 2019 was "subpar, at best," and provided a number of examples of performance issues, including missing

deadlines and submitting work last minute, needing multiple reminders to complete tasks, and difficulty adapting to change.

Unfortunately for Arnold, "the fact that [she] disagrees with her supervisor's assessment does not establish pretext." *Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022); *see also Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 738 (7th Cir. 2011) (noting that if employee's disagreements with employer's negative assessment of employee's performance "were enough to avoid summary judgment and go to trial on an indirect proof case, summary judgment would become extinct and employer's evaluations would be supplanted by federal juries' evaluations"), *overruled on other grounds by Ortiz*, 834 F.3d 760; *Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 839 (N.D. Ill. 2017) (the plaintiff could not create an issue of fact by claiming he was performing adequately or by challenging his supervisors' assessment of his performance). Arnold's belief that she was performing her job adequately "is not relevant to the question of whether [United] believed it had a legitimate, non-discriminatory basis" for the alleged adverse action. *Lauth v. Covance, Inc.*, 863 F.3d 708, 715–16 (7th Cir. 2017); *see also Simpson v. Beaver Dam Cmty. Hosp., Inc.*, 780 F.3d 784, 795 (7th Cir. 2015) ("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain its decision.") (cleaned up).

And, the fact that Arnold had never received less than "achieves" on past evaluations under different supervisors does not factor into the analysis. *See Peele v.*

21

*Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("[T]he issue is not the employee's past performance but 'whether the employee was performing well at the time of [her] termination.'" (second alteration in original) (quoting *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991))); *see also Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) ("The question is not whether she *ever* satisfied the Hospital's expectations, but whether she met the Hospital's expectations *at the time she was fired*."); *Truesdale v. Maine Twp. High Sch. Dist. No. 207*, 2006 WL 2375469, at *9 (N.D. Ill. 2006) (employer's expectations must be considered at the time of the adverse action because the "quality of an employee's performance may change over time" and "the people who evaluate that performance may change as well").

At bottom, the only evidence Arnold provides for pretext is her belief that the actions taken against her were due to her age. S*ee Lauth.*, 863 F.3d at 716 ("[Plaintiff] has failed to point to any evidence, other than his belief that [his employer's] assessments of his workplace behavior were mistaken, from which a jury could infer that [his employer] terminated him because of his age. Therefore, his age discrimination claim fails.").

Finally, even viewing the evidence in Arnold's favor, no reasonable jury could conclude that age discrimination was the "but-for" cause of the alleged adverse actions. "At the end of the day, the question is simply whether the same events would have transpired if [Arnold] had been younger than 40 and everything else had been the same."

*Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 725 (7th Cir. 2018) (cleaned up). Based on the undisputed facts, the answer is yes.

Viewing the evidence holistically, a reasonable factfinder could not conclude Arnold's age caused the adverse employment actions at issue here (to the extent they can even be counted as adverse). *See id.* In sum, Arnold "has failed to marshal evidence in the record indicating, even when viewed in [her] favor, a genuine dispute of material fact as to whether [she] was discriminated against in violation of the ADEA." *Murphy v. Caterpillar, Inc.*, 2024 WL 520020, at *15 (C.D. Ill. 2024). United is entitled to summary judgment on Arnold's age discrimination claims.

## II.    Retaliation Claims

To survive summary judgment on her retaliation claims, Arnold must offer evidence of: "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Skiba*, 884 F.3d at 718. "For purposes of retaliation, an adverse employment action is one that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Abebe*, 35 F.4th at 607 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (cleaned up).

Arnold claims she engaged in "several instances" of protected activity: (1) when she complained in 2017 about age and disability discrimination; (2) when she reported Jones for sexual harassment in 2018; (3) when she made internal complaints about having the Core4 project taken away and given to a younger employee; (4) when

she complained about having to sit near Jones in 2019; (5) when she complained about the way she was treated during her 2019 year-end review; and (6) when she complained about the PIP process.

First of all, for a complaint to qualify as "statutorily protected activity," it "must be about the [challenged] discrimination." *McHale v. McDonough*, 41 F.4th 866, 871 (7th Cir. 2022). "In order for [Arnold's] complaints to constitute protected activity, they must include an objection to discrimination on the basis of age." *Smith v. Lafayette Bank & Tr. Co.*, 674 F.3d 655, 658 (7th Cir. 2012) (citing 29 U.S.C. § 623); *see also Lauth.*, 863 F.3d at 717; *Howard v. Indianapolis Pub. Schs.*, 727 F. App'x 198, 202 (7th Cir. 2018) ("[T]he judge correctly explained that a report of misconduct . . . must concern . . . age discrimination to be protected activity under the ADEA."). While "an employee need not use . . . magic words," like "age," *see Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003), "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). As such, Arnold's complaints about Jones cannot support her retaliation claims.

While Arnold's 2017 complaint about age discrimination counts as a protected activity, no reasonable juror could conclude a causal connection exists between that complaint and any of the adverse actions. At a minimum, the events are simply far too attenuated to permit an inference of a retaliatory motive. An inference of retaliation

"can be weakened by 'a lengthy time period between the protected activity and the alleged retaliation.'" *Alamo v. Bliss*, 864 F.3d 541, 556 (7th Cir. 2017) (quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014)); *see also Lalvani v. Cook Cnty., Ill.*, 269 F.3d 785, 790 (7th Cir. 2001) ("As the time separating the protected conduct and the adverse employment action grows, the causal inference weakens and eventually time becomes the plaintiff's enemy.").

It is unclear from the record whether Arnold complained of age discrimination in connection with her complaints about her year-end review and the PIP process. To the extent that her complaints about her negative performance reviews and the PIP constituted protected activity, "[p]erformance improvement plans, particularly minimally onerous ones . . . are not, without more, adverse employment actions." *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011); *see also Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014) (negative performance reviews and PIPs are not adverse employment actions); *Cole v. Illinois*, 562 F.3d 812, 816–17 (7th Cir. 2009) (placing the plaintiff on "employee improvement plan" that required him to submit daily and weekly schedules to supervisors not materially adverse action).

Additionally, Arnold has not come forth with evidence from which a factfinder could infer causation or retaliatory intent. In the retaliation context, an employee can establish causation with circumstantial evidence, such as "suspicious timing, a pretextual explanation for the termination [or adverse action], and evidence that

25

similarly situated employees were treated differently." *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018). As we noted above, Arnold has not demonstrated pretext. And suspicious timing alone is not enough to survive summary judgment. *See id.* (citing *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011)); *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016) ("A causal link requires more than the mere fact that an employer's action happens after an employee's protected activity."). Nor is Arnold's own belief or speculation that an action was retaliatory. *See*, *e.g.*, *Formella*, 817 F.3d at 516; *Brown v. Advocate S. Suburban. Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) ("[Plaintiff] must produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have."). To the extent that the Coworker can be considered a similarly situated employee, United has offered legitimate reasons why the Coworker was not put on a PIP despite having some similar performance issues. Schall testified that there may have been times that the Coworker missed deadlines, but the Coworker's handling of it was very different than Arnold's handling of the same issue, and that the Coworker was communicative about adjusting and reestablishing deadlines, something Arnold did not do.

For all of these reasons, United is entitled to summary judgment on Arnold's retaliation claims.

## III.    Hostile Work Environment Claim

Next, United argues it is entitled to summary judgment on Arnold's hostile work environment claim. We agree. Because the Seventh Circuit uses Title VII's framework

26

for analyzing hostile work environment claims brought under the ADEA, the Court does so here as well. *See Tyburski v. City of Chicago*, 964 F.3d 590, 600 (7th Cir. 2020).

An employer creates a hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). To prevail on such a claim, "a plaintiff must show: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Trahanas v. Northwestern Univ.*, 64 F.4th 842, 853 (7th Cir. 2023). Several considerations play into whether an environment is hostile: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Casino Queen*, 739 F.3d at 982 (quoting *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691–92 (7th Cir. 2005)). What matters is whether the conduct became so severe or pervasive that "a reasonable person would find [it] hostile or abusive." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993).

Arnold's allegations are merely "a series of minor or trivial employment actions" that, even considered in combination, do not rise to the level of an abusive work

environment. Importantly, Arnold has failed to show that any of the alleged harassing incidents were based on her age or her age-based protected activities. And no reasonable juror could conclude that Arnold was subjected to a working environment "permeated with discriminatory intimidation, ridicule, and insult" to support a hostile working environment claim. *See*, *e.g.*, *Hambrick v. Kijakazi*, 79 F.4th 835, 843 (7th Cir. 2023) ("heavy workload, management's high expectations, and routine workplace discipline" is not enough); *Duniya v. Power*, 2023 WL 2755132, at *4 (N.D. Ill. 2023) (complaints of "being assigned additional duties, having a temporary assignment cancelled, having other duties taken away from him, being verbally admonished during a meeting, receiving poor marks on his evaluation, having overtime payment requests denied, being bullied, and receiving a suspension" are "general workplace complaints [that] do not allow the Court to infer that a reasonable person would find his work environment hostile and instead appear to merely reflect Duniya's displeasure with his supervisors' management of his work."); *Dodgen v. AARP*, 2022 WL 4607926, at *4 (N.D. Ill. 2022). United is entitled to summary judgment on Arnold's hostile work environment claim.

## IV.    Constructive Discharge Claim

Finally, Arnold brings a claim for constructive discharge. As an initial matter, Arnold fails to respond to United's argument that the claim is unexhausted, thereby waiving any argument against it. "[D]istrict courts have routinely found constructive discharge claims unexhausted if the EEOC charge was filed prior to the plaintiff's

resignation and the plaintiff did not amend her charge or otherwise bring the resignation to the EEOC's attention during the investigation process." *Shuler v. McCarthy*, 2019 WL 13171974, at *3 (C.D. Ill. 2019) (collecting cases). As United correctly notes, Arnold filed her discrimination charge with the IDHR on March 2, 2020, long before she sent her May 20, 2020 retirement email, and Arnold never filed a subsequent or amended charge. The Court therefore finds Arnold failed to exhaust this claim; it is dismissed without prejudice. *See McHale v. McDonough*, 41 F.4th 866, 872 (7th Cir. 2022) ("When a plaintiff fails to exhaust administrative remedies, her complaint must be dismissed without prejudice. And when a district court grants summary judgment in that situation instead of dismissing without prejudice, we have remanded so that it may correct its mistake.") (internal citation omitted); *Teal v. Potter*, 559 F.3d 687, 693 (7th Cir. 2009).

Even if it had been exhausted, Arnold's claim of constructive discharge would not survive summary judgment. "A plaintiff asserting that she resigned (here, forcibly retired) due to alleged *discriminatory* harassment must 'show working conditions even more egregious than that required for a hostile work environment claim.'" *Gordon v. DeJoy*, 2023 WL 4762595, at *4 (N.D. Ill. 2023) (quoting *Brooks v. City of Pekin*, 2023 WL 3355320, at *16 (C.D. Ill. 2023)) (emphasis added). Arnold does not point to evidence from which a reasonable jury could find the existence of such treatment.

Arnold's argument that her constructive discharge claim could still survive summary judgment because "courts have stated that '[w]hen an employer acts in a

manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge,'" is unpersuasive.  Dkt. # 45, at 15 (quoting *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)).  Arnold might be correct on the law, but the evidence does not support this theory.

Under this theory of constructive discharge, Arnold must show that she was forced to resign because her "working conditions [became] so intolerable that a reasonable person would have felt compelled to resign."  *Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225 (7th Cir. 2022) (citation omitted).  "In other words, constructive discharge occurs where, based on an employer's actions, the handwriting was on the wall and the axe was about to fall." *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1119 (7th Cir. 2022) (cleaned up); *see also Hunt v. City of Markham*, 219 F.3d 649, 655 (7th Cir. 2000) ("A person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with his employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable.").  However, a "working condition does not become intolerable or unbearable merely because a prospect of discharge lurks in the background."  *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (cleaned up).

Arnold says she was continually reminded her job was on the line based on the PIP policy, she was told by Michelson when attempting to resolve the seating issue that

she would need to decide if she wanted to continue working for United long-term, and Schall repeatedly told Arnold she was not meeting the expectations of the PIP. These things are a far cry from what was found sufficient in *University of Chicago Hospitals*, which is the only case Arnold cites in support of this argument. There, the plaintiff returned to work to find her belongings packed and her office converted to storage. 276 F.3d at 331.

Arnold invites the Court to speculate that she would have been discharged at her final PIP meeting. "We are particularly loath to engage in such guesswork in the constructive discharge context, where we recognize that the burden remains on the employee to show why [she] would have had to quit immediately." *Ziccarelli v. Dart*, 35 F.4th 1079, 1092 (7th Cir. 2022) (citing *Chapin*, 621 F.3d at 680) (cleaned up). To the extent her constructive discharge claim was exhausted, summary judgment would be warranted.

## **CONCLUSION**

For the foregoing reasons, United's Motion for Summary Judgment [42] is granted. Judgment is entered in favor of United on Arnold's ADEA and IHRA discrimination and retaliation claims, and her hostile work environment claim. Arnold's constructive discharge claim is dismissed without prejudice as unexhausted. Civil case terminated.

It is so ordered.

_____
Charles P. Kocoras
United States District Judge

Date: June 11, 2024